COURT OF CHANCERY
OF THE
STATE OF DELAWARE

MORGAN T. ZURN
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

January 27, 2023

Thomas A. Uebler, Esquire
McCollom, D'Emilio, Smith, Uebler LLC
2751 Centerville Road, Suite 401
Wilmington, DE 19808

Kurt M. Heyman, Esquire
Heyman, Enerio, Gattuso & Hirzel LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801

Loren R. Barron, Esquire
Margolis Edelstein
300 Delaware Avenue, Suite 800
Wilmington, DE 19801

Stephen B. Brauerman, Esquire
Bayard, P.A.
600 North King Street, Suite 400
Wilmington, DE 19801

RE: *Patrick Daugherty v. James Dondero, et al.,*
Civil Action No. 2019-0956-MTZ

Dear Counsel:

On May 15, 2020, plaintiff Patrick Daugherty filed his amended complaint in this action (the "Amended Complaint").[1] In March of 2021, this matter was stayed in view of a related bankruptcy. But today I write to resolve three motions, which I collectively refer to as the "Motions to Dismiss": (1) the Motion to Dismiss the Amended Verified Complaint filed by defendant Michael Hurst;[2] (2) the Motion to Dismiss or, in the Alternative, Stay Plaintiff's Verified Amended Complaint filed by defendants James Dondero, Highland Employee Retention Assets LLC ("HERA"), Highland ERA Management LLC ("HERA

---

[1] Docket Item ("D.I.") 28 [hereinafter Am. Compl.].

Management"), Scott Ellington, Thomas Surgent, and Issac Leventon (collectively the "Highland Defendants");[3] and (3) the Motion to Dismiss Plaintiff's Verified Amended Complaint filed by defendants Marc Katz and Hunton Andrews Kurth LLP's ("Andrews Kurth" and collectively the "Andrews Kurth Defendants" and together with Hurst and the Highland Defendants, "Defendants").[4] I conclude that Daugherty has impermissibly split his claims. Defendants' Motions to Dismiss are granted.

## I. BACKGROUND[5]

Daugherty was a partner and senior executive of nonparty Highland Capital Management L.P. ("Highland Capital"). In 2009, Highland Capital formed HERA, a Delaware limited liability company. Highland Capital granted Daugherty and other employees "equity-like awards in certain funds, and then distribut[ed] the

---

[2] D.I. 31.

[3] D.I. 32.

[4] D.I. 34.

[5] All facts are drawn from the Amended Complaint, the documents integral to it, and those that are incorporated by reference. *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004).

proceeds of those interests to the employees in their capacity as unit holders of HERA."[6]  Daugherty was also a director of HERA.

Daugherty has had a difficult relationship with Highland Capital and its principals for over a decade.  He resigned from Highland Capital on September 28, 2011, though he continued to hold an interest in HERA.  He contends that in February 2012, his adversaries began a multi-step plan designed to deprive him of that HERA interest.

In 2012, Highland Capital sued Daugherty in a Texas court, and Daugherty responded by filing counterclaims against Highland Capital and third-party claims against HERA and others.  During those proceedings, certain Defendants created an escrow to hold Daugherty's HERA interest pending the resolution of the litigation, which they represented would be transferred to him if he prevailed.  But Daugherty contends the escrow was created to allow those Defendants to represent to the Texas judge and jury that they had not deprived Daugherty of his interest: according to Daugherty, those Defendants never intended to transfer Daugherty's interest to him, even if he won.

---

[6] Am. Compl. ¶ 20.

Daugherty did win on at least one of his claims.[7]  The Texas jury found in his favor and awarded him damages of $2.6 million plus interest against HERA (the "Texas Judgment").  The verdict was appealed, and the Texas Court of Appeals affirmed the trial court's decision on December 1, 2016, making the Texas Judgment collectable.  Shortly thereafter, the escrow agent resigned and the escrowed assets were transferred to Highland Capital, not back to HERA.  Moreover, Daugherty alleges that before the Texas Judgment became final, certain Defendants caused a disproportionate amount of legal fees from those proceedings to be allocated to HERA.  With the assets transferred to Highland from the escrow, and in light of the fee allocations, HERA no longer held any assets and so could not satisfy the Texas Judgment.  Daugherty alleges he has been unable to collect the Texas Judgment.

On July 6, 2017, Daugherty sued Highland Capital and the Highland Defendants in this Court (the "First Delaware Action").[8]  His claims generally fall into three categories:  (1) the transfer of HERA's assets out of escrow; (2) amendments to HERA's LLC agreement introduced by certain Defendants; and (3)

---

[7] The Texas jury also awarded Highland Capital attorneys' fees of $2.8 million.

[8] *Daugherty v. Highland Cap. Mgmt., L.P.*, 2017-0488-MTZ (Del. Ch.) [hereinafter First Del. Act.], D.I. 1.

indemnification and fees on fees relating to the Texas litigation.[9] Over the next two years, the Court issued two written decisions resolving motions to dismiss,[10] the parties engaged in various other motion practice,[11] Daugherty filed two amended complaints,[12] and the parties completed discovery. On July 11, 2018, Dondero was dismissed from the case, leaving Highland Capital, HERA, and HERA Management as the only defendants.[13] The case proceeded to trial on October 14, 2019.

---

[9] *Id.* ¶¶ 73–119.

[10] First Del. Act., D.I. 36; *Daugherty v. Highland Cap. Mgmt.*, 2018 WL 417270 (Del. Ch. Jan. 16, 2018); First Del. Act., D.I. 66; *Daugherty v. Highland Cap. Mgmt., L.P.*, 2018 WL 3217738 (Del. Ch. June 29, 2018).

[11] *See, e.g.*, First Del. Act., D.I. 61 (motion for a protective order); First Del. Act., D.I. 106 (motion to compel escrow agent's documents pursuant to crime-fraud exception); First Del. Act., D.I. 133 (motion for partial summary judgment); First Del. Act., D.I. 152 (motion for status quo order); First Del. Act., D.I. 207 (motion for rule to show cause why defendants should not be held in contempt); First Del. Act., D.I. 210 (motion to compel discovery relating to escrow); First Del. Act., D.I. 211 (motion for reargument concerning motion to compel); First Del. Act., D.I. 220 (motion to stay pending interlocutory appeal); First Del. Act., D.I. 229 (motion for partial summary judgment); First Del. Act., D.I. 259 (motion for protective order); First Del. Act., D.I. 269 (motion to compel and submit to a continued deposition); First Del. Act., D.I. 270 (motion to compel testimony); First Del. Act., D.I. 298 (motion in limine); First Del. Act., D.I. 299 (motion in limine); First Del. Act. at D.I. 329 (motion for continuance); First Del. Act., D.I. 355 (motion to continue confidential treatment of certain joint exhibits).

[12] First Del. Act., D.I. 77; First Del. Act., D.I. 127.

[13] First Del. Act., D.I. 68.

On the morning of October 16, 2019—the third day of trial—the defendants informed the Court that Highland Capital filed for bankruptcy.[14]  All proceedings against Highland Capital were automatically stayed, and the parties agreed that the rest of the First Delaware Action should also be stayed.[15]  Those proceedings remained stayed, and the trial record remains open.

Plaintiff initiated this action on December 1, 2019, and filed the Amended Complaint on May 15, 2020.[16]  The Amended Complaint asserts claims against all defendants in the First Delaware Action (including Dondero) other than Highland Capital.  It added as new defendants Highland Capital's outside counsel (Andrews Kurth, Katz, and Hurst) and three of Highland Capital's in-house counsel (Ellington, Leventon, and Surgent).  The new allegations in the Amended Complaint center on these new Defendants' participation in transferring HERA's assets out of escrow and otherwise assisting in devaluing or appropriating Daugherty's HERA interest.  The Amended Complaint arises out of the same

---

[14] First Del. Act., D.I. 362.

[15] *Id.*; First Del. Act., D.I. 358.

[16] D.I. 1; Am. Compl.

series of actions at issue in the First Delaware Action—a point Daugherty readily admits.[17]

On July 15, 2020, Defendants filed the Motions to Dismiss pursuant to Court of Chancery Rule 12(b)(6).[18] The Highland Defendants also moved in the alternative to stay this action.[19] Daugherty asserted claims relating to the Texas Judgment and other damages sought in the Delaware actions as a creditor in Highland Capital's bankruptcy, so I granted the stay pending the resolution of Highland Capital's bankruptcy proceedings.[20] The bankruptcy proceedings remain ongoing, but Daugherty has reached a settlement of his claims against Highland Capital.[21]

On a May 5, 2022, status conference, I requested that the parties provide supplemental briefing on the issues of claim splitting and the Texas attorney

---

[17] D.I. 46 at 26 [hereinafter Ans. Br.] ("There is no real dispute between Daugherty and the Defendants that the claims in this action are part of the same common nucleus of fact.").

[18] D.I. 31; D.I. 32; D.I. 34.

[19] D.I. 32.

[20] D.I. 61; D.I. 62 at 59–64.

[21] D.I. 66; D.I. 69 at 2–3; D.I. 92 at 6–7 [hereinafter Supp. Ans. Br.].

immunity doctrine[22] for purposes of determining whether some or all of the claims set forth in the Amended Complaint could be resolved on the pleadings and without intruding on the bankruptcy proceedings.[23] The parties filed their supplemental briefs[24] and I heard argument on October 6, 2022.[25]

## II.  ANALYSIS

The standard governing Defendants' Motions to Dismiss is as follows:

> (i) [A]ll well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and [(iv)] dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[26]

Defendants moved to dismiss the Amended Complaint on the basis of claim splitting. The claim splitting doctrine requires that a plaintiff raise all legal

---

[22] Under the Texas attorney immunity doctrine, "an attorney is immune from liability to nonclients for conduct within the scope of his representation of his clients." *Youngkin v. Hines*, 546 S.W.3d 675, 681 (Tex. 2018). The parties dispute both the availability and applicability of this protection in this case. This letter resolves Defendants' Motions to Dismiss under the doctrine of claim splitting, so I do not reach whether the Texas immunity doctrine applies.

[23] D.I. 86 at 22–30.

[24] D.I. 87; D.I. 88; D.I. 90; Supp. Ans. Br.; D.I. 98; D.I. 100; D.I. 101.

[25] D.I. 103; D.I. 104. I also draw on the parties' earlier briefing on these same issues. D.I. 31; D.I. 33; D.I. 35; Ans. Br.; D.I. 53; D.I. 54; D.I. 55.

[26] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes omitted) (quoting *Kofron v. Amoco Chems. Corp.*, 441 A.2d 226, 227 (Del. 1982)).

theories arising from a common nucleus of operative fact in one action so long as she has had a full and free opportunity to do so.[27]   A final judgment in the first-filed action is not a necessary element of the doctrine.[28]  Claim splitting may bar a second cause of action even where there is not complete overlap between the named defendants.[29]  The burden is on the plaintiff to show that she could not have raised her new claims in the first proceeding.[30]  Two principles drive the claim

---

[27] *J.L. v. Barnes*, 33 A.3d 902, 918 (Del. Super. 2011); *see also Goureau v. Lemonis*, 2021 WL 1197531, at *9 (Del. Ch. Mar. 30, 2021) (reasoning the claim splitting doctrine can apply to a series of related transactions).  Claim splitting will not be applied where a plaintiff "could not for jurisdictional reasons have presented his claim in its entirety in a prior or parallel adjudication." *Barnes*, 33 A.3d at 920 (internal quotation marks omitted) (quoting *Maldonado v. Flynn*, 417 A.2d 378, 383 (Del. Ch. 1980)).

[28] *See Balin v. Amerimar Realty Co.*, 1995 WL 170421, at *4 (Del. Ch. Apr. 10, 1995) (explaining that the "basic difference" between res judicata and claim splitting "is that *res judicata* precludes the relitigation of factual and legal issues previously decided in an earlier lawsuit, while the rule against claim splitting eliminates the contemporaneous litigation of the same factual or legal issues in different courts"); *Hawkins v. Daniel*, 2021 WL 3732539, at *12–14 (Del. Ch. Aug. 24, 2021) (considering simultaneously pending actions); *Goureau*, 2021 WL 1197531, at *8 (same); *Barnes*, 33 A.3d at 917–18 (same); *Winner Acceptance Corp. v. Return on Cap. Corp.*, 2008 WL 5352063, at *18 (Del. Ch. Dec. 23, 2008) (noting the policy of claim splitting is intended to avoid both "overlapping [and] repetitive actions in different courts or at different times" (internal quotation marks omitted) (quoting *Balin*, 1995 WL 170421, at *4)); *see also* 18 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 4406 (4th ed.) ("In dealing with simultaneous actions on related theories, courts at times express principles of 'claim splitting' that are similar to claim preclusion, but that do not require a prior judgment.").

[29] *Barnes*, 33 A.3d at 918–19 (considering that substantial factual overlap between the two pending actions made it likely that the defendants would be subjected to claims or third-party claims for contribution in each case).

[30] *Maldonado*, 417 A.2d at 383–84.

splitting doctrine: (1) "that no person should be unnecessarily harassed with a multiplicity of suits"; and (2) a litigant should be prohibited "from getting 'two bites at the apple.'"[31]

Daugherty's First Delaware Action asserted claims arising out of, among other things, the transfer of HERA assets from the escrow. Those proceedings were stayed by the automatic bankruptcy stay and by consent. Daugherty then filed this second action, asserting claims that he concedes arise from the same common nucleus of operative fact,[32] which he describes as only "nominally new,"[33] against overlapping and additional defendants. These simultaneously pending, overlapping cases undoubtedly risk subjecting Defendants to multiple judgments and potentially risk giving Daugherty two chances at prevailing on claims arising from the same series of transactions (in addition to his third opportunity as a creditor in Highland Capital's bankruptcy). Indeed, Daugherty

---

[31] *Barnes*, 33 A.3d at 918 (internal quotation marks omitted) (quoting Joseph E. Edwards, LL.B, Annotation, *Waiver of, by Failing to Promptly Raise, Objection to Splitting Cause of Action*, 40 A.L.R.3d 108 (1971), and then *Balin*, 1995 WL 170421, at *1).

[32] Ans. Br. at 26.

[33] Supp. Ans. Br. at 2–3.

does not dispute that he has engaged in claim splitting; he argues he should be excused from the consequences of doing so.[34]

Daugherty urges this Court to apply an exception to the claim splitting doctrine that, in other jurisdictions, forecloses dismissal where a plaintiff could not have discovered a cause of action due to the defendant's fraud or concealment.[35] He contends he did not assert his claims against the additional defendants earlier because, according to Daugherty, Dondero stated for the first time at trial that Highland Capital was relying on the advice of counsel in carrying out the underlying acts.[36]

---

[34] *See* D.I. 104 at 43 ("I agree with one thing [Defendants] said. The claims were split, but where I take issue is that the claim splitting was improper here."); Supp. Ans. Br. at 7–10.

[35] Supp. Ans. Br. at 7–10 (citing *Havercombe v. Dep't of Educ. of the Commonwealth of P.R.*, 250 F.3d 1, 8 n.9 (1st Cir. 2001)).

[36] Ans. Br. at 29.

If I were to implement this exception to improper claim splitting, this case would not satisfy it. Daugherty has failed to persuade me that the defendants in the First Delaware Action concealed either the attorney defendants' involvement in the underlying events or the principals' intention to rely on advice of counsel to defeat the claims against them. The defendants in the First Delaware Action indicated they would argue that they did not act with the mental state required for Daugherty's claims because they relied on the advice of counsel, but it appears Daugherty did not pursue documents or testimony under the at-issue exception until his objection to Dondero's trial testimony.

The defendants in the First Delaware Action consistently pled an affirmative defense that they "did not act with the necessary knowledge, intent, or scienter, and instead acted in good faith and with due care at all times."[37] On January 9, 2019, they responded to Daugherty's interrogatory requesting the basis for that defense by stating, in relevant part, that "[t]he Amended Complaint alleges no specific facts establishing that the transfer of the Deposit Assets was made with the actual intent to hinder, delay, or defraud," and that "Defendants' Counsel," among others,

---

[37] First Del. Act., D.I. 81 at Affirmative Defense ¶ 8; First Del. Act., D.I. 238 at Affirmative Defense ¶ 8 (same).

have knowledge concerning this defense.[38]  Daugherty did not move to compel a more expansive response.  On March 22, 2019, Daugherty noticed service of a subpoena *duces tecum* on Andrews Kurth LLP requesting documents relating to the escrow.[39]  It is not clear to me whether Daugherty ever received those documents, but he never filed a motion to compel relating to that subpoena.  Daugherty also moved for the commission of a subpoena *ad testificandum* to be served on Katz.[40]  That motion was denied without prejudice, and the Court expressly permitted Daugherty to renew that motion after obtaining other discovery if he could demonstrate that there were "gaps in the record he needs to fill."[41]  He never did so.  Likewise, in a May 24, 2019 motion to compel, Daugherty expressed concerns with the defendants' April 2019 privilege log, but he did not seek relief on any entry on the basis of the at issue exception.[42]  When

---

[38] First Del. Act. at Joint Exhibit 582 at res. 64.

[39] First Del. Act., D.I. 139.

[40] First Del. Act., D.I. 140.

[41] First Del. Act., D.I. 218 at 16–18.  That other discovery included certain documents from Highland Capital's Delaware counsel for its actions relating to the escrow, pursuant to the crime-fraud exception. *Id.* at 14–15.

[42] First Del. Act., D.I. 210 at 4, 6–9.

Dondero was deposed on August 6, 2019, it appears that he conveyed that he relied on the advice of counsel several times as to several different matters.[43]

In pretrial briefing, the First Delaware Action defendants' brief included multiple references to the advice of counsel defense, and expressly argued that the defendants relied on their Delaware counsel's advice as a defense to several of the claims relating to the escrow.[44]

And so, leading up to trial, it appears Daugherty was on notice that the First Delaware Action defendants might argue that their reliance on the advice of counsel foreclosed a finding that they held the requisite intent in taking the

---

[43] First Del. Act., D.I. 349, Ex. G at 48 ("[**Q.**] So is it your position that HERA was receiving $9.5 million worth of services from Highland at the time? **A.** Yeah. I believe it would have been an appropriate transfer. That's why it was done. **Q.** And what makes it appropriate, in your view? **A.** It was strategized, reviewed, and vetted by counsel as appropriate, given facts and circumstances, expenses and ownership. **Q.** Okay. Apart from the belief of Highland's in-house or outside counsel about the appropriateness, do you have -- is anything else in forming your position that the transfer was appropriate? **A.** I rely on their expertise."); *id.* at 52 ("**Q.** Do you remember communicating with anybody in or around December 2013 regarding the escrow? **A.** No. It wouldn't -- it wouldn't have been my idea, but it would've been the advice of counsel."); *id.* at 54 ("**Q.** You said it would -- when you were referring to the escrow, you said it would've been the advice of counsel. Which counsel are you referring to? **A.** I don't know. **Q.** Highland counsel? **A.** No. It would've -- yeah, it would've been external counsel, but I don't know which one. **Q.** Okay. So outside counsel? **A.** Yes. **Q.** To Highland? **A.** I don't know. **Q.** Was it Andrews Kurth? **A.** I don't know. **Q.** Who, apart from Andrews Kurth, was Highlands [sic] outside counsel related to the Texas case? **A.** I don't know. **Q.** And as far as you can recall, you never communicated with Abrams & Bayliss about the escrow? **A.** Correct.").

complained-of actions. He also was on notice that he did not know what that advice was. He investigated the defendants' affirmative defense and conducted discovery to his apparent satisfaction in the First Delaware Action.

In opposing the Motions to Dismiss, Daugherty argues Defendants raised the advice of counsel defense for the first time at trial. His briefing cites a number of pages of trial testimony, without explaining how any of that testimony supports his position.[45] In the hearing, he focused on the following testimony, which he argued constituted new information:[46]

> Q. Did Highland have outside counsel advising with respect to the purchase of the units?
>
> A. Yes. I believe the whole situation was the most lawyered thing we've ever done. I mean, there was counsel for each of the board members, there was counsel for Highland, there was counsel for HERA, there was Delaware counsel. Everything was orchestrated, dictated by counsel.
>
> Q. Did Highland have -- did that counsel that Highland used also advise counsel on the documents, the transaction documents, relating to those purchases?
>
> A. Yes. All the functional documents and major moves at various turning points were all at the request -- or decided by counsel.[47]

---

[44] First Del. Act., D.I. 323 at 26, 35–36, 42–43.

[45] Ans. Br. at 29 (citing First Del. Act., D.I. 361 at 284–85, 288, 293, 298–99, 300, 308–13, 325–27, 342).

[46] D.I. 104 at 45–48.

[47] First Del. Act., D.I. 361 at 284.

. . .

Q. Did you have any communication -- are you familiar with Abrams & Bayliss, with what Abrams & Bayliss is?

A. I know they're a Delaware law firm.  But beyond that, no.

Q. Did you ever have any communications with Abrams & Bayliss about them resigning as escrow agent?

A. No. Highland and myself, I know, were purposely kept separate from this whole thing. And it was driven by -- it was driven by counsel.[48]

. . .

Q. My question is a little bit more specific because it relates to the escrow assets and Mr. Daugherty.  If you had been told by counsel that Mr. Daugherty was entitled to the escrow assets, you would have given him the escrow assets; right?

A. Yes. We would have done whatever counsel told us. We tried very hard to compartmentalize this mess. We have a business to run. And this is -- a half dozen lawsuits, haranguing everybody in public, it was all intended to disrupt our business as much as possible.  So we tried to delegate it and compartmentalize it to the lawyers as much as possible.[49]

. . .

---

[48] *Id.* at 288.

[49] *Id.* at 325–26.

Q. Let's talk about which lawyers you're referring to. So I'll start with the in-house lawyers again. Which in-house lawyers of Highland are you relying on with respect to the transfer of the escrow assets?

A. It would have been the same three internal lawyers working with external counsel.

Q. Mr. Ellington, Mr. Leventon, and Mr. Surgent; is that right?

A. I believe so. I believe they were the ones at that time and place.

Q. Which outside counsel are you relying on?

A. I don't know if Andrews and Kurth had merged with Piper. I don't know who else was involved besides the Abrams guys. But it would have been, more likely than not, those two counsels with whatever other counsel was representing some of the people who were sued individually.[50]

Additionally, Daugherty's counsel clarified with Dondero that he had testified he had relied on counsel in connection with buying out other HERA unitholders.[51]

Then, and only then, did Daugherty object. He did not object to any of the above testimony as introducing a new, unexpected, or potentially waived defense. Rather, Daugherty took issue with the fact that the defendants asserted attorney-client privilege over their counsel's advice, arguing privilege was waived under the

---

[50] *Id.* at 326.

[51] *Id.* at 292–293.

at-issue exception and that he "reserve[d] the right to pursue the at-issue waiver in the event that anyone else at Highland might recall the advice that was received."[52]

But as explained, Daugherty was aware of the defense before that testimony, and had an opportunity to pursue any legal advice put at issue before Dondero's trial testimony. Daugherty cannot avoid the consequences of his claim splitting on the assertion that he was surprised at trial in the First Delaware Action.[53]

---

[52] *Id.* at 300; *id.* at 293 ("MR. UEBLER: Your Honor, the defendants are using the attorney-client privilege as a sword and a shield. The purposes [sic] of the testimony is to establish, at least as far as I understand it, if this buyout process was proper. And Mr. Dondero has testified today that it was done at the advice of counsel. If they're going to rely on that advice to support any positions that they're taking in this case, we're entitled to know what that advice was. THE COURT: . . . You're asserting the at-issue exception? MR. UEBLER: Yes.").

[53] Daugherty also suggests that he had to file a separate action because the automatic bankruptcy stay precluded amending his complaint in the First Delaware Action. Supp. Ans. Br. at 2–3 ("Daugherty filed the nominally new action against the defendants Dondero implicated as the root bad actors because Daugherty could not take action in the original case due to the automatic stay."); *id.* at 7 ("Because the evidence was withheld, Daugherty did not have the evidence to assert all of his claims in the first action. Then he was stymied by the automatic stay."). He has failed to demonstrate that Dondero's trial testimony would have justified a late and prejudicial amended pleading in the First Delaware Action (if it had not been stayed). A surprise defense at trial is not typically resolved by the plaintiff filing an amended complaint. Rather, where a defendant raises an argument or invokes for the first time a defense in the middle of a trial, the most sensible outcome is a finding that the party waived its argument or defense. *See Barra v. Adams*, 1994 WL 369532, at *6 (Del. Ch. July 1, 1994) ("As a procedural matter, the estoppel defense comes too late, as it was never pleaded or even referred to in the pretrial order" and instead raised the for the first time at trial); *Carberry v. Redd*, 1977 WL 9561, at *1–2 (Del. Ch. Jan. 19, 1977) (holding statute of limitations defense was waived where it was included in an answer filed after trial preparation had already begun); *see also Knutkowski v. Cross*, 2011 WL 6820335, at *2 n.10 (Del. Ch. Dec. 22, 2011) ("Although

Daugherty also argues that the policy concerns driving the claim splitting doctrine are not implicated here because they can be addressed by consolidating this action with the First Delaware Action. I reject this argument as well. "The Court has ample discretion in considering how to remedy claim splitting."[54] And under Court of Chancery Rule 42, the Court may consolidate actions pending before the Court whenever they "involve[] a common question of law or fact."[55] Claim splitting is not implicated unless the claims share a common nucleus of operative fact.[56] To accept Daugherty's solution would mean that the doctrine of claim splitting, which as explained can apply to contemporaneously pending actions, could never bar a second claim pending before this Court.

In addition, Court of Chancery Rule 1 states that the Court's rules "shall be construed, administered, and employed by the Court . . . to secure the just, speedy

---

it is indisputably the general rule that a party's failure to raise an affirmative defense in the appropriate pleading results in waiver, . . . there is ample authority in this Circuit for the proposition that absent unfair surprise or prejudice to the plaintiff, a defendant's affirmative defense is not waived when it is first raised in a pre-trial dispositive motion. . . . This view is in accord with the vast majority of our sister circuits." (alterations in original) (internal quotation marks omitted) (quoting *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 612 (4th Cir. 1999))). Such an amendment would not have been proper if the case had proceeded; that it was stayed does not make the amendment proper.

[54] *Goureau*, 2021 WL 1197531, at *12.

[55] Ct. Ch. R. 42(a).

[56] *See, e.g.*, *Winner Acceptance Corp.*, 2008 WL 5352063, at *18.

and inexpensive determination of every proceeding."[57]  It is difficult to see how any of Rule 1's purposes would be served by implementing Rule 42 as Daugherty suggests.  After more than two years of hard-fought litigation involving extensive motion practice, Daugherty is effectively requesting that I permit him to amend his complaint on the third day of trial to add, among other things, five new defendants to the case, based on a legal theory and discovery position he was on notice of during discovery.  To allow consolidation here would only make an already procedurally complicated situation even more complicated just as it is approaching its resolution.  I deny Daugherty's request for consolidation.

Defendants' Motions to Dismiss are **GRANTED.**  The dismissal of the Amended Complaint is without prejudice.

**IT IS SO ORDERED**.

Sincerely,

*/s/ Morgan T. Zurn*

Vice Chancellor

MTZ/ms

cc:  All Counsel of Record, via *File & ServeXpress*

---

[57] Ct. Ch. R. 1.